HENRY F. TURNER, Judge pro tern.
This is a suit for Workmen’s Compensation benefits by Rosa Nell Dunbar, the widow of a deceased employee who was killed while in the course and scope of his employment with defendant. The defendant employer, Edward Levy Metals, Inc., contends that no Workmen’s Compensation benefits are due plaintiff because she was separated in fact from her husband, Philip Dunbar, and was not dependent on him for support at the time of his death. This defense forms the sole issue in this case.
The Louisiana Workmen’s Compensation statute, LSA-R.S. 23:1254, provides:
“In all cases provided for under this Part the relation or dependency must exist at the time of the accident and at the time of death, and the mere expectation or hope of future contribution to support of an alleged dependent by an employee, shall not constitute proof of dependency as a fact.”
And LSA-R.S. 23:125S:
“No compensation shall be payable under this Part to a widow unless she was living with her deceased husband at the time of the injury or death, or was then actually dependent upon him for support. No compensation shall be payable under this Part to a widower unless he was living with his deceased wife at the time of the injury and death or was at such time incapable of self-support and actually dependent upon her for support.”
The plaintiff had ceased living with her husband two to eight years before his death and had left his home in New Orleans to go to Baton Rouge, where she lived with and cared for her semi-invalid father. She testified that her only income during the period she lived with her father was the approximately $40.00 to $50.00 per month that she received from her husband and small amounts of money she earned occasionally as a domestic servant. She testified that her father’s only income was his old-age pension. She stated that she made an average of two trips a month to the city of New Orleans to attend her church and that her husband left her an envelope containing $20.00 to $25.00 with the pastor of her church or his wife every two weeks. She further stated that she received a letter from her husband only a short time before his death, asking her to come back to him in New Orleans, that she had agreed, and that they had already made arrangements for a home to live in. Plaintiff testified that on her visits to New Orleans she stayed at the home of the pastor or at that of her sister, but not with her husband.
The pastor of plaintiff’s church testified that he knew Rosa Nell Dunbar and her husband, Philip Dunbar, and that Rosa Nell Dunbar was a member of his church and would come down from Baton Rouge to attend his services once or twice a month. He further stated that Philip Dunbar regularly left sealed envelopes for Rosa Nell Dunbar at the church with the pastor’s wife. He also said that Philip Dunbar maintained his wife’s dues in a religious and fraternal association connected with the church.
*908 The pastor’s wife, who is a relative of plaintiff, testified that about every two weeks Philip Dunbar would leave with her an envelope containing what she knew to be money. She said the envelope was always sealed, but she knew it to contain money. This envelope she would deliver to Rosa Nell Dunbar when she came to New Orleans for the church services.
Roosevelt Stewart, who was connected with the church, testified that he knew plaintiff and her deceased husband; was related to both of them; saw both of them occasionally at the church; and about two weeks before Philip Dunbar’s death had written a letter for him to his wife, requesting that she return to live with her husband. Pie stated that he wrote the letter because Philip Dunbar was unable to write, and that Philip Dunbar had given him $5.00 to enclose with the letter.
It was established that Philip Dunbar earned $66.50 take-home pay per week. Defendant introduced the testimony of one Mincie Mitchell, who testified that she lived with Philip Dunbar from the time his wife left him until about 10 months before his death. She stated that he maintained them in his home and paid all their bills. She stated that she did not know whether he was sending any money to his wife. Defendant also introduced the testimony of one Melva Bailey to the effect that she had “took up” with Philip Dunbar from the time Mincie Mitchell left him until his death. She stated that she spent three or four nights a week at his home and that he paid for all groceries, etc.
Philip Dunbar was also shown to have provided small amounts of money for support of his granddaughter (who was not living with him) when his daughter would come to him and ask for it.
Evidence was elicited to the effect that Philip -Dunbar consumed moderately large amounts of alcohol at a bar near his home that he visited almost daily, but always on Friday and Saturday evenings.
The trial court gave judgment to plaintiff awarding her the minimum benefits — ■ $10.00 per week for 400 weeks, whence this appeal.
As stated above, plaintiff had been separated from her husband for a period of some years. Although she claims to have been on good terms with him, she never visited him at her former home on the many visits she claims to have made to New Orleans. He, in turn, does not seem to have wanted to see her, and had, as they put it, “took up” with a succession of other women. These women he at least partially supported financially.
The testimony of plaintiff and Roosevelt Stewart as to a letter that Philip Dunbar allegedly sent to plaintiff shortly before his death asking her to return to him strikes us as incredible. All plaintiff’s witnesses testified that plaintiff and her husband both visited the home of the minister regularly. He could have brought up this delicate subject there, where he could have spoken to her personally.
Although the deceased always signed his letters by making an “X”, he failed to do so in this one letter, allegedly sent by him. It also strikes us as strange that he would go apartment hunting with his wife while he continued to maintain a concubine in his matrimonial domicile. His wife was not supposed to know that another woman was occupying her former place. It is also strange that she made no attempt to return to the deceased at a house he already had rented and was occupying.
These considerations are mentioned here, not because we think the letter would be valid evidence if authentic, but rather because we think the testimony regarding it detracts seriously from the weight to be given the rest of plaintiff’s evidence.
The burden of proof in this compensation case, wherein the plaintiff claims to be a dependent of the deceased, is upon her to prove by a preponderance of evi *909 dence her dependency and also that the deceased has contributed to her support. In this case, plaintiff had attempted to show that her deceased husband, with whom she had not lived for a period varying (from the testimony) from three to eight years, left varying amounts of money in an envelope with Reverend Jackson, the pastor of her church, or with the pastor’s wife for the period of plaintiff’s sojourn in Baton Rouge. The pastor and his wife both testified that the deceased left an envelope with them ever)’- two weeks which was in turn delivered to the plaintiff. Her cousin, Roosevelt Stewart, testified that in the letter above referred to he enclosed the sum of $5.00 from the deceased to the plaintiff. Outside of that statement, there is no direct evidence in the record other than that of the claimant that her husband gave her any amount of money. While she claims total dependency on her deceased husband for her support, her testimony is vague, conflicting, and inconclusive as to the amounts she received and how. At one point in her testimony she claims that she received the payments by mail. She claims to have received varying amounts from $20.00 to $31.00 every two weeks during her absence from her husband. She offered no explanation as to why she did not at any time during her stay in Baton Rouge return to her husband at their matrimonial domicile during her numerous visits to New Orleans.
While it is true that the judge of the District Court heard and saw the witnesses, the fact that he gave the bare minimum compensation leads to but one conclusion, and that is that he did not believe the plaintiff’s testimony in toto. Otherwise, he would have had to find her totally dependent, and the award would have been greater than the minimum under the Workmen’s Compensation Act which he allowed. The judge of the lower court did not favor us with written reasons, and we are at a loss to understand how he reached the conclusion of dependency based on the conflicting testimony of the plaintiff in this case, which is, in the final analysis, all the testimony we have as to the support furnished by the deceased. We note that the plaintiff’s pastor referred to the envelope, testified to by his wife as containing money, as a “bag”. Certainly, a minister of the Gospel would know the difference between a bag and an envelope. We find similar inconsistencies and contradictions throughout the testimony of the plaintiff’s witnesses.
Added to the inconsistencies and irreconcilable statements made by plaintiff and her witnesses, we find from the evidence introduced on behalf of the defendant that the deceased, while earning approximately $66.50 per week take-home pay, had weekly obligations which would have consumed this amount to below the amount claimed by plaintiff to have been contributed by him to her.
It is contrary to all human conduct of people of the deceased’s social standing and attainments to continue to support a wife who had left him over a period of from two to eight years, while at the same time maintaining and supporting two different concubines in the matrimonial domicile. Considering all these factors, it is our conclusion that the plaintiff has failed to bear the burden of proof imposed upon her and has failed to prove her case to the reasonable satisfaction of this court by a fair preponderance of the evidence.
The judgment of the District Court is therefore reversed, and plaintiff’s suit dismissed at her cost.
Reversed.